IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Alexandria Division

| | |
|---|---|
| HANOVER INSURANCE COMPANY, ) <br> Plaintiff, ) <br> ) <br> v. ) <br> ) <br> M&T BANK, *et al.*, ) <br> Defendants. ) | Case No. 1:11cv11 |

## MEMORANDUM OPINION

At issue in this diversity action is whether plaintiff surety's breach of contract claim against defendant bank is barred by Va. Code § 8.4-406(f) because the surety failed to notify the bank of improper withdrawals from a guardianship account within one year. For the reasons that follow, a surety with limited signatory authority over a guardianship account is not a "customer" within the meaning of the Code, and hence the Code's statutory notice provision does not apply. Accordingly, the motion to dismiss must be denied.

I.[1]

Plaintiff, Hanover Insurance Company ("Hanover"), is a New Hampshire corporation with its principal place of business in Massachusetts. Hanover is authorized and licensed to engage in the surety business in Virginia. Defendants, M&T Bank and M&T Bank Corporation ("M&T defendants"), are New York corporations with their principal place of business in Buffalo, New York. The M&T defendants are financial institutions doing business in Virginia as the successors in interest to Provident Bank.

This lawsuit arises out of the improper management of a guardianship account. Patricia Fallon and Lawrence Fabian were appointed by the Stafford County Circuit Court to serve as co-

---

[1] The facts are derived from the plaintiff's complaint and the documents attached thereto.

guardians for Fallon's grandson, K.F., on June 10, 2004. Over the course of the guardianship, Fallon received funds from the September 11 Victim's Compensation Fund ("VCF") for the use and benefit of K.F. Pursuant to the Stafford County Circuit Court's June 10, 2004 Order, the co-guardians were permitted to use all funds received from the VCF for the benefit of K.F. as provided for in Va. Code § 31-8.

In conjunction with their appointment as co-guardians, Fallon and Fabian posted a bond in the amount of $696,000 issued by Hanover as surety. As a condition for issuing the bond, Hanover required the co-guardians to place all guardianship funds in an account with a financial institution that would execute a Joint Control Agreement. Hanover, Fallon, and M&T Bank (f/k/a Provident Bank) executed a Joint Control Agreement on June 8, 2004. In relevant part, the Joint Control Agreement provided that M&T Bank would not honor Fallon's withdrawal slips, receipts, or other orders in an amount exceeding $5,000 unless the item was countersigned by a representative of Hanover. The Joint Control Agreement identified Fabian as Hanover's authorized representative. Thus, in effect, the Joint Control Agreement prevented Fallon from withdrawing a sum of money exceeding $5,000 from the guardianship account at any time without obtaining Fabian's signature. Of course, nothing in the Joint Control Agreement prevented Fallon from making any number of withdrawals for less than $5,000 each without Fabian's signature.

On or about June 10, 2004, Fallon opened an account at M&T Bank in her own name and that of K.F. Hanover was not named on the account. Over the next few years, M&T Bank permitted Fallon, in breach of the Joint Control Agreement, to make at least ten withdrawals of $10,000 from the guardianship account without Fabian's signature. According to Hanover, the

funds withdrawn from the guardianship account in contravention of the Joint Control Agreement were not used for K.F.'s benefit.

After the guardians repeatedly failed to submit proper accountings, the Stafford County Circuit Court removed Fallon and Fabian as guardians on August 3, 2009. At a hearing on November 2, 2009, the Stafford County Circuit Court concluded that the guardians misappropriated $240,468.87 in guardianship funds and ordered Hanover to reimburse the guardianship estate for $240,468.87. Hanover was also ordered to pay $10,172 and $2,500 to the Acting Commissioner of Accounts and a private accounting firm, respectively, for their work in auditing the guardianship estate's financial records. Hanover complied and then commenced this suit on January 6, 2011.

In a one-count complaint, Hanover claims that the M&T defendants breached the terms of the Joint Control Agreement by permitting Fallon to withdraw money from the guardianship account in excess of $5,000 without Fabian's signature. Hanover argues that the M&T defendants' breach of the Joint Control Agreement caused Hanover damages in the amount of the checks and withdrawals that were permitted in contravention of the Joint Control Agreement (approximately $100,000). Hanover further argues that the M&T defendants' failure to put Hanover on notice of Fallon's withdrawals in excess of $5,000 permitted Fallon to continue to misappropriate guardianship funds in small amounts, causing Hanover to sustain additional damages (approximately $140,000). Thus, Hanover argues that the M&T defendants are liable for the total amount that Hanover was required to pay to the guardianship estate, which equals $253,140.87.

## II.

Dismissal pursuant to Rule 12(b)(6), Fed. R. Civ. P., is appropriate where the complaint does not "contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). It follows that to survive a Rule 12(b)(6) motion to dismiss, a complaint must contain "more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Id.* Thus, "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.* Instead, the complaint must allege facts that, if true, plausibly satisfy each element of the claims for which relief is sought. Accordingly, a motion to dismiss must be granted if the complaint does not allege a sufficient factual basis to create a plausible inference that the plaintiff is entitled to relief.

## III.

The M&T defendants have challenged whether there is subject matter jurisdiction over this case. As this is a diversity action, subject matter jurisdiction exists only if the parties are citizens of different states and the amount in controversy exceeds $75,000, exclusive of interest and costs. *See* 28 U.S.C. § 1332(a)(1). Here, there is no dispute that the parties are citizens of different states. The complaint alleges that Hanover is a New Hampshire corporation with its principal place of business in Massachusetts, and the M&T defendants are New York corporations with their principal place of business in New York. Instead, the parties dispute whether the amount in controversy exceeds $75,000.

In this regard, it is well-settled that "[i]f the plaintiff claims a sum sufficient to satisfy the statutory requirement, a federal court may dismiss only if 'it is apparent to a legal certainty, that the plaintiff cannot recover the amount claimed.'" *JTH Tax, Inc. v. Frashier*, 624 F.3d 635, 638

(4th Cir. 2010) (quoting *St. Paul Mercury Indem. Co. v. Red Cab Co.*, 303 U.S. 283, 288 (1938)). Here, although Hanover has claimed damages totaling $253,140.87, which far exceeds the $75,000 minimum, the M&T defendants argue that it is legally certain that Hanover's damages are only $16,000. According to the M&T defendants, the Stafford County Circuit Court, which determined that Fallon misappropriated $240,468.87 in guardianship funds, arrived at this figure after the Acting Commissioner of Accounts reviewed the guardianship estate's financial records and compiled a list of every transaction involving guardianship funds. The Acting Commissioner of Accounts then went line-by-line through the list of transactions and, for each transaction determined whether the money was spent for a permitted or unpermitted purpose, approving the former and disapproving the latter. The total amount of the disapproved transactions was $240,648.87. Importantly, there was only one disapproved transaction for more than $5,000—a single check written for $16,000. Thus, the M&T defendants contend that although Hanover was required to reimburse the guardianship estate for a total of $240,684.87, only $16,000 of the total damages sought is attributable to a breach of the Joint Control Agreement because that is the amount of money that was misappropriated as a result of M&T Bank's failure to deny checks and withdrawal slips not bearing Fabian's signature.

Hanover responds by arguing that Fallon made ten withdrawals of at least $10,000 and these withdrawals were not used for the benefit of the child. Thus, Hanover contends that there is at least $100,000 in direct damages. Although the remainder of the $240,684.68 in damages resulted from withdrawals under $5,000 for which no second signature was required, Hanover argues that the M&T defendants are nonetheless liable for these damages as well. Specifically, Hanover argues that had M&T Bank notified Hanover that Fallon was attempting to withdraw sums in excess of $5,000 without a co-signature, Hanover would have investigated and stopped

Fallon from misappropriating guardianship funds in smaller amounts. Thus, Hanover argues that the M&T defendants are liable for the total amount of funds that Hanover was ordered to pay to the guardianship estate, which equals $253,140.87.

After reviewing the evidence in the record, the M&T defendants' argument is ultimately unpersuasive. The record evidence[2] shows that Fallon made ten withdrawals of at least $10,000 from one of the guardianship accounts, and the Acting Commissioner of Accounts submitted an affidavit stating that the $240,684.87 in disallowed expenses on the final accounting report includes those withdrawals. According to the Acting Commissioner of Accounts, those ten withdrawals do not appear as "disbursements" on the final accounting report because Fallon had two guardianship accounts at the bank, and those ten transactions were transfers from one guardianship account to another. In other words, on at least ten occasions, Fallon made withdrawals from one guardianship account without obtaining Fabian's signature on the checks or withdrawal slips and then deposited the proceeds into another guardianship account at the bank. Fallon then allegedly spent those funds in an impermissible manner. This is sufficient to establish an amount-in-controversy in excess of $75,000.[3] Thus, there is diversity jurisdiction in this case.

---

[2] A court may consider extrinsic evidence when deciding a motion to dismiss for lack of subject matter jurisdiction, pursuant to Rule 12(b)(1), Fed. R. Civ. P., without converting the motion to one for summary judgment. *See Velasco v. Gov't of Indon.*, 370 F.3d 392, 389 (4th Cir. 2004).

[3] Neither reached nor decided here is whether the M&T defendants are liable for the funds that were withdrawn from the bank in amounts less than $5,000 and spent in an impermissible manner. It is worth noting, however, that under Virginia law, there must be a causal connection between the breach of contract and the damages claimed. *See Haass & Broyles Excavators v. Ramey Bros.*, 355 S.E.2d 313, 315 (Va. 1987). In this respect, Hanover argues that a causal connection exists between M&T Bank's failure to enforce the Joint Control Agreement and Fallon's ability to misappropriate small sums of money. Specifically, Hanover argues that had M&T Bank notified Hanover that Fallon was trying to withdraw large sums without Hanover's signature, it would have investigated and discovered that Fallon was also making smaller withdrawals and spending the smaller sums in an impermissible manner. Yet, this argument

## IV.

The M&T defendants seek threshold dismissal of Hanover's suit on the ground that Hanover failed to comply with the Virginia Code's statutory notice provision.[4] Under Virginia law, if a bank sends or makes available to its customer a statement of account, the customer must notify the bank of any improper payments based on unauthorized signatures within one year of receiving the statement, or else the customer is barred from bringing claims against the bank for damages caused by the improper payments. *See* Va. Code § 8.4-406(f).[5] The M&T defendants argue that Hanover failed to satisfy this "condition precedent"[6] to filing suit against the bank because Hanover did not notify M&T Bank within one year that Fallon was making withdrawals in excess of $5,000 without Fabian's signature.[7]

---

seems unpersuasive because there is nothing in the Joint Control Agreement that requires M&T to notify Hanover whenever Fallon attempted to make a withdrawal of more than $5,000 without Hanover's signature. M&T Bank's only obligation was to decline to honor such a withdrawal. Thus, it is unclear how M&T Bank's failure to abide by its contractual obligation to refuse to honor checks in excess of $5,000 without Hanover's signature in any way caused Fallon to make withdrawals less than $5,000 and to spend the money in an impermissible manner.

[4] The parties do not dispute that Virginia law governs this dispute. *See Klaxon v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496 (1941).

[5] Virginia Code § 8.4-406(f) provides, in pertinent part, as follows:

> Without regard to care or lack of care of either the customer or the bank, a customer who does not within one year after the statement or items are made available to the customer (subsection (a)) discover and report the customer's unauthorized signature on or any alteration on the item is precluded from asserting against the bank the unauthorized signature or alteration.

[6] *Halifax Corp. v. First Union Nat'l Bank*, 546 S.E.2d 696, 702-03 (Va. 2001) (noting that "[t]he customer's compliance with th[e] one-year statutory notice provision is a condition precedent to the customer's right to file an action against the bank to recover losses caused by the unauthorized signature or alteration").

[7] An item (*e.g.*, check) that contains less than the required number of signatures amounts to an "unauthorized signature." *See* Va. Code 8.3A-403, Official Comment 4.

Although Hanover does not dispute that it failed to notify M&T Bank of Fallon's unauthorized withdrawals within one year of those withdrawals, Hanover's suit is not barred by § 8.4-406(f). During oral argument, the M&T defendants conceded that M&T Bank did not provide Hanover with statements concerning the guardianship account,[8] and it further conceded that Hanover could not have obtained bank statements on request.[9] Given that Hanover was not provided with the information necessary to determine whether an unauthorized payment was made from the guardianship account in accordance with § 8.4-406(a), the statutory notice provision found in Va. Code § 8.4-406(f) does not apply, and hence Hanover's claim is not barred by its failure to notify M&T Bank of Fallon's improper withdrawals within one year.

Additionally, § 8.4-406(f) does not bar Hanover's breach of contract claim because Hanover is not a "customer" of M&T Bank within meaning of the Code. The Code defines "customer," in relevant part, as "a person having an account with a bank or for whom a bank has agreed to collect items." Va. Code § 8.4-104(a)(5). A "person" is defined as "an individual, corporation, business trust, estate, trust, partnership, limited liability company, association, joint venture ... or any other legal or commercial entity." *Id.* § 8.1A-201(27). An "account" is defined as "any deposit or credit account with a bank." *Id.* § 8.4-104(a)(1). Although Virginia case law addressing the meaning of "customer" is sparse, the existing authority points persuasively to the conclusion that where, as here, a surety's only connection with an account is the limited authority to prohibit withdrawals in excess of $5,000, the surety is not a "customer" within the meaning of the Code.

---

[8] *See* March 18, 2011 Hr'g Tr. 18:8-11.

[9] *See* March 18, 2011 Hr'g Tr. 23:10-24:6.

The Supreme Court of Virginia addressed the meaning of "customer" in *United Virginia Bank v. E.L.B. Tank Constr. Co.*, 311 S.E.2d 773 (Va. 1984). There, a construction company, E.L.B., maintained a bank account at United Virginia Bank, and its general contractor, William W. Flippo, Jr., deposited funds into the account to pay for work performed by E.L.B. After a dispute arose between E.L.B. and Flippo, the bank permitted Flippo to withdraw funds he had deposited into E.L.B.'s account. On these facts, the Supreme Court of Virginia concluded that the bank was liable for the withdrawal because E.L.B. was the customer on the account and it had not authorized the transaction. *Id.* at 776. In determining that E.L.B., and not Flippo, was the "customer" on the account, the Supreme Court of Virginia noted that (i) the account was established in E.L.B.'s name, (ii) only E.L.B.'s representatives had authority to withdraw funds from the account, and (iii) the bank sent monthly statements to E.L.B. *Id.* at 775. The Supreme Court of Virginia rejected the argument that Flippo was a "customer" on the account because he had deposited funds into the account. Under Virginia law, because Flippo deposited the funds into E.L.B.'s account for E.L.B.'s benefit, E.L.B. was the actual depositor and hence the bank's "customer." *Id.*

More recently, the Supreme Court of Virginia addressed the meaning of "customer" in *Collins v. First Union Nat'l Bank*, 636 S.E.2d 442 (Va. 2006). In *Collins*, a corporate entity, InterBank, defrauded foreign investors attempting to obtain permanent resident visas. As part of the fraudulent scheme, InterBank opened bank accounts for the benefit of the foreign investors and then siphoned money from the accounts. The foreign investors filed suit against the bank, arguing that the bank owed duties to them because they were "customers" within the meaning of the Code. The Virginia Supreme Court rejected the investors' argument, concluding that InterBank was the bank's "customer" because InterBank opened the accounts and had signatory

authority over the accounts. *Id.* at 445-46. Relying on *E.L.B. Tank Constr. Co.*, the Virginia Supreme Court held that it was insignificant that the foreign investors were the source of the funds that were eventually deposited by InterBank into the accounts. *Id.*[10]

Thus, in determining whether a person is the "customer" of a bank within the meaning of the Code, the Supreme Court of Virginia has made clear that it is appropriate to consider a number of factors, including (i) whether the person is named on the account; (ii) whether the person opened the account; (iii) whether the person deposited money into the account; (iv) whether the person has authority to withdraw funds from the account; and (v) whether the person receives statements of account from the bank. *See Collins*, 636 S.E.2d at 445-46; *Radin*, 457 S.E.2d at 66; *E.L.B. Tank Constr. Co.*, 311 S.E.2d at 775. Here, these factors point persuasively to the conclusion that Hanover is not a "customer" of M&T Bank with respect to the guardianship account. Hanover attached a bank statement for the guardianship account to its complaint and the bank statement makes clear that the account holders are Fallon and her grandson, not Hanover. Moreover, as explained above, the M&T defendants conceded at oral argument that Hanover was not entitled to obtain bank statements showing Fallon's withdrawals from the guardianship account. To be sure, Hanover did have limited signatory authority over the account. But signatory authority does not necessarily make a person a "customer" of a bank.[11] Furthermore, Hanover's signatory authority did not permit it to withdraw funds from the guardianship account. To the contrary, it merely allowed Hanover to prohibit withdrawals in

---

[10] The Supreme Court of Virginia's decision in *Collins* is consistent with its earlier decision in *Radin v. Crestar Bank*, 457 S.E.2d 65, 66 (Va. 1995), holding that an attorney who opened a fiduciary account in which he deposited his client's funds was a "customer."

[11] *Cf. Thrash v. Georgia State Bank of Rome*, 375 S.E.2d 112, 113 (Ga. Ct. App. 1988) (holding that plaintiff, an officer and shareholder of a corporation with signatory authority over the corporation's checking account, was not a "customer" of the bank and could not file suit for wrongful dishonor of the corporation's checks).

amounts exceeding $5,000 by refusing to counter-sign Fallon's checks or withdrawal slips. This type of limited signatory authority, alone, is insufficient to render a person a "customer" within the meaning of the Code.[12]

The M&T defendants rely chiefly on *American Ins. Co. v. Fid. Bank & Trust Co. of New Jersey*, 583 A.2d 361 (N.J. Super. Ct. App. Div. 1990), to support their argument that Hanover's limited signatory authority made it a "customer." In *American Insurance*, the court held that a surety's claim for breach of contract was barred by the New Jersey Code because the surety was a "customer" of the bank and had failed to notify the bank of unauthorized signatures on checks within one year of receiving bank statements. In that case, the surety entered into a joint control agreement with a bank that prohibited the bank from honoring any checks drawn on a guardianship account unless the checks contained the signatures of the guardian and a representative of the surety. The court concluded that the surety was a "customer" of the bank by applying a definitional analysis. Specifically, the court noted that a "customer" is defined as "a person having an account with a bank," and a "person" includes an "organization." *Id.* at 363. Because New Jersey law defined "organization" as "[two] or more persons having a joint or common interest," the court concluded, without analysis, that the surety and the guardian should be considered an "organization." *Id.* Thus, according to the court, the surety and guardian, taken together, constituted a "customer" under the New Jersey Code. And, because bank statements were sent to one half of the "organization,"—that is, the guardian—the surety had notice of the improper payments and was required to notify the bank of those payments within the required

---

[12] It is worth noting that at least some courts in other jurisdictions have concluded that a person with signatory authority over an account is a "customer" of the bank if the bank is aware that the person has a beneficial interest in the funds in the account. *See Schoenfelder v. Arizona Bank*, 796 P.2d 881, 889 (Ariz. 1990); *First Nat'l Bank of Springdale v. Hobbs*, 450 S.W.2d 298, 301-02 (Ark. 1970). These non-binding cases are not persuasive here because they are factually distinguishable.

time period as a prerequisite to filing suit. *Id.*; *see also Travelers Indem. Co. v. Trust Co. Bank*, 495 S.E.2d 296 (Ga. Ct. App. 1997) (relying on reasoning in *American Insurance* to conclude that surety was a "customer" by virtue of joint control agreement with bank).

Although *American Insurance* is factually somewhat similar, it is neither binding authority nor is its reasoning persuasive. Even assuming that Virginia defines "organization" as "two or more persons having a joint or common interest," it is not clear why the New Jersey superior court concluded that the guardian and surety had a joint or common interest. Indeed, it appears more reasonable to conclude that a surety and a guardian have conflicting interests. A guardian has an interest—albeit an unlawful one—in misappropriating guardianship funds. A surety, on the other hand, has an economic interest in ensuring that guardianship funds are not spent for impermissible purposes because the surety is liable for reimbursing the guardianship estate for misappropriated funds. Indeed, the divergent interests of a surety and guardian are what prompt most sureties to require a joint control agreement as a precondition for issuing surety bonds. The surety wants the ability to monitor the guardianship account to ensure the funds are used appropriately. Under these circumstances, it defies reason to conclude that a surety and guardian have common interests and that a surety is properly notified of withdrawals if a statement is sent to the guardian. If the guardian is misappropriating funds from the guardianship account, the guardian has an obvious incentive not to share the bank statements with the surety.

Moreover, the New Jersey superior court's definitional analysis is unpersuasive here because Virginia law employs different definitions. In Virginia, a "customer" is defined as "a person having an account with a bank." Va. Code § 8.4-104(5). A "person" is defined, in turn, as "an individual, corporation, business trust, estate, trust, partnership, limited liability company,

association, joint venture, government, governmental subdivision, agency, or instrumentality, public corporation, or any other legal or commercial entity." *Id.* § 8.1A-201(27). The definition of "person" does not include "organization." Yet, even if it did, Virginia law defines "organization" as a "person other than an individual." *Id.* § 8.1A-201(25).[13] Thus, an "organization" under Virginia law is any of the business entities listed in the definition of "person." These definitions applied here make clear that Hanover and Fallon, taken together, do not constitute an "organization" or "person" under Virginia law because Fallon and Hanover have not formed any of the business entities listed in the definition of "person." Thus, Fallon and Hanover cannot be considered a single "customer" of the bank.[14]

Finally, in their supplemental brief, the M&T defendants argue that Hanover's suit is barred by the three year statute of limitations governing conversion claims. *See* Va. Code § 8.3A-118(g). Although Hanover has not brought a conversion claim, the M&T defendants assert, without analysis, that Hanover's breach of contract claim is displaced by § 8.3A-420(a),

---

[13] In their opening brief, the M&T defendants stated that § 8.1-201(30) defines "person" as including "an organization." The M&T defendants further stated that § 8.1-201(28) defined "organization" as "two or more persons having a joint or common interest." In their reply brief, the M&T defendants admitted that there initial brief was inaccurate and the correct citations for "person" and "organization" are found at §§ 8.1A-201(27) and (25), respectively. Yet, § 8.1A-201(27) does not define "person" as including "an organization," and Va. Code § 8.1A-201(25) does not define "organization" as "two or more persons having a joint or common interest."

[14] The M&T defendants also cite *Amico Centennial Ins. Agency, Inc. v. First Nat'l Bank of St. Bernard Parish*, 543 So.2d 527 (La. Ct. App. 1989), for the proposition that a signatory on an account is a customer. In *Amico*, the court concluded that an insurance company was precluded from filing suit against its bank for honoring checks with only one signature, even though the instructions on the signature card required all checks to have two signatures. The insurance company received statements showing that the bank was honoring checks with only one signature and the insurance company failed to notify the bank. The court did not address whether the persons authorized to sign checks on behalf of the insurance company were also customers of the bank. Thus, *Amico* does not stand for the proposition that the signatories on an account are necessarily "customers" of the bank.

which provides a cause of action for conversion of negotiable instruments.[15] The M&T defendants are correct that the Code displaces the common law in situations where the Code provides a remedy for a specific factual situation. *See* Va. Code § 8.1-103. Yet, § 8.3A-420(a) does not apply here because Hanover is not the owner (*i.e.*, payee or endorsee) of the checks Fallon submitted to M&T Bank for payment.[16] Thus, Hanover's breach of contract claim is not displaced by the Code's conversion provision, and § 8.3A-118(g)'s three-year statute of limitations for conversion claims does not apply.

V.

Because Hanover's suit is not barred by either Va. Code 8.4-406(f) or Va. Code 8.3A-118(g), the M&T defendants' motion to dismiss must be denied.

An appropriate Order will issue.

Alexandria, Virginia
May 5, 2011

/s/

T. S. Ellis, III
United States District Judge

---

[15] Va. Code § 8.3A-420(a) provides, in relevant part, as follows:

> The law applicable to conversion of personal property applies to instruments. An instrument is also converted if it is taken by transfer, other than a negotiation, from a person not entitled to enforce the instrument or a bank makes or obtains payment with respect to the instrument for a person not entitled to enforce the instrument or receive payment. An action for conversion of an instrument may not be brought by (i) the issuer or acceptor of the instrument or (ii) a payee or endorsee who did not receive delivery of the instrument either directly or through delivery to an agent or a co-payee.

[16] *Cf. Stefano v. First Union Nat'l Bank of Virginia*, 981 F. Supp. 417, 420-21 (E.D. Va. 1997) (holding that plaintiff's common law conversion claim was displaced by § 8.3A-420(a) where bank deposited checks payable to plaintiff in another person's account without plaintiff's endorsement).